NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0038n.06

Nos. 19-3265/3442

## UNITED STATES COURT OF APPEALS
### FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

  Plaintiff-Appellee,

v.

JASON E. COUSINS (19-3265); MAURICE
STEWART (19-3442),

  Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)
)
)
)

FILED
Jan 19, 2021
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE NORTHERN
DISTRICT OF OHIO

---

BEFORE:  GUY, BOGGS, and WHITE, Circuit Judges.

BOGGS, Circuit Judge. In these consolidated cases, Jason Cousins and Maurice Stewart appeal their convictions by jury trial. Because Mr. Cousins's sole count of unlawful possession of a firearm was prejudicially misjoined with the drug and gun charges against his two codefendants, we vacate his conviction and remand for retrial. But the search resulting in the evidence against Mr. Stewart was reasonable under the Fourth Amendment, and Mr. Stewart's other claims are meritless. We therefore affirm his conviction.

## I. FACTUAL BACKGROUND

### A. The Drug-Trafficking Operation

In October 2016, Markianna Conley and Willie Richardson-Fields were two 19-year-old high-school sweethearts who had just graduated. They had moved from Detroit, Michigan, to Canton, Ohio, near where Ms. Conley's mother lived. With her mother's help, Ms. Conley found a

house on Dartmouth Avenue; rent and the security deposit would cost $1,400. Without a job at that point, Ms. Conley relied on family for help. Remarkably, her cousin Maurice Stewart—whom she had never physically met before she moved to Canton—paid the security deposit and at least the first month's rent for the Dartmouth house, fully furnished it with furniture and appliances, and offered to let Ms. Conley and Mr. Richardson-Fields live there for free.

But shortly after the couple moved into the Dartmouth house, a "friend of the family," William Moore, came to stay there "out of the blue." Apparently without much discussion, he gradually moved himself into the house, sometimes sleeping on the living room couch; other times sleeping in an upstairs bedroom. His only possessions were an Xbox One and a suitcase containing clothes and $10,000 cash that Mr. Stewart had given him. It turned out that Mr. Moore was on the run from drug and gun charges in West Virginia, and Mr. Stewart had brought him to the Dartmouth house to hide out.

While Mr. Moore stayed there, he and Mr. Stewart ran a drug operation out of the house. Mr. Stewart paid Ms. Conley $100 to $150 for her and Mr. Richardson-Fields to break open capsules of sleep aids and get out the powder inside. Mr. Moore then cut heroin with that powder to stretch out the supply of heroin and increase sales.

Messrs. Stewart and Moore sent Ms. Conley and Mr. Richardson-Fields on errands in furtherance of the operation. They sent Ms. Conley to the store to buy masks and razor blades that were later used in processing crack. They also sent Mr. Richardson-Fields (purportedly at the direction of Jason Cousins, Ms. Conley's uncle) to deliver heroin to Ms. Conley's great-uncle.

There were two handguns on the top shelf of a cabinet in the Dartmouth house kitchen. Also in the cabinet were drug-making supplies: gloves, masks, sleeping pills, quinine, acetone, baking soda (used to cut crack cocaine), a blender, and baggies to store finished product.

**B. Two More Firearms**

Mr. Cousins did not spend much time, if any, at the Dartmouth house. His involvement in this case arises from two other firearms found there—an AR-15 semiautomatic rifle and a shotgun. Ms. Conley and Mr. Richardson-Fields brought the firearms over from another house owned by James Williams (also known as "Roe"), another of Ms. Conley's cousins. Mr. Richardson-Fields put the shotgun in the closet in the Dartmouth house's upstairs bedroom, and Mr. Moore put the AR-15 in a downstairs closet.

Mr. Richardson-Fields testified that, at Roe's house, there was a "big argument over the phone" between Roe and Mr. Cousins, and "neither one of them wanted" the guns at Roe's house. According to Mr. Richardson-Fields, Roe was at the house, but Mr. Cousins was not. He testified that he could hear the argument because it was over the phone—"on speaker phone." He testified that he heard that "basically Roe said [the guns] were [Mr. Cousins's], and he said he didn't want his stuff there." But Mr. Richardson-Fields testified that nobody directly told him to remove the firearms. He also testified that he was the only one to touch the guns at Roe's house that evening. He admitted on cross-examination that there were about five other people present in the room at the time, that the TV was on, that he had only met Mr. Cousins four or five times beforehand, and that Mr. Cousins never followed up with him about the firearms.

Ms. Conley testified about the argument as well. She stated that it started because Roe had pawned Mr. Cousins's PlayStation. The argument then moved onto the topic of Mr. Cousins's dogs, which were staying at Roe's house, before turning to the firearms. According to Ms. Conley, Roe told Mr. Cousins that the guns could not stay at Roe's house, and Mr. Cousins told her and Mr. Richardson-Fields to "take them around the corner where [they]'re at." Ms. Conley contradicted Mr. Richardson-Fields, saying that not he but another of her cousins took the guns out and

put them into Roe's living room; likewise, she testified that one of her cousins, not Mr. Richardson-Fields, put the firearms in the car used by her and Mr. Richardson-Fields. On cross-examination, she confirmed Mr. Richardson-Fields's testimony that it was "pretty noisy" in the living room and that there were a "bunch of people." But she testified that Roe was *not* there, contradicting Mr. Richardson-Fields's testimony. Instead, she described a scene in which Mr. Cousins called her phone, one of her cousins took her phone and put it on speaker phone, another of her cousins was on the phone with Roe, and her cousins relayed messages between Roe and Mr. Cousins. She also confirmed that Mr. Cousins did not follow up about the firearms even though he later came to visit the Dartmouth house.

### C. The Bust

The U.S. Marshals Service tracked Mr. Moore to the Dartmouth house on November 17, 2016. Deputy Marshal Eric Midock testified that he saw two rental cars in the house's driveway, which he found suspicious because "a lot of times, especially in Canton, Ohio, people who are selling drugs tend to rent cars." Only Mr. Moore, Mr. Stewart, and Ms. Conley were at the house when the task force arrived; Mr. Richardson-Fields had left earlier in one of the rental cars. Deputy Marshal Midock stopped Mr. Richardson-Fields "a little ways" from the house and questioned him, but he was "unwilling" to say where he was coming from, who was at the Dartmouth house, or whether there were firearms there. Deputy Marshal Midock released Mr. Richardson-Fields after finding no outstanding warrants for him.

An officer reported over the radio that he saw "a black male who looked out of the window" of the second floor of the Dartmouth house—the officer apparently did not determine whether it was the task force's target, Mr. Moore. Another officer reported that the front door was open but that "a female walked up to that door and closed it." Deputy Marshal Midock returned to the house

and knocked on the front door. After a period of time, Ms. Conley answered the door, and Deputy Marshal Midock asked her whether Mr. Moore was there. He testified that she was "evasive" and "extremely nervous" and did not answer.

Ms. Conley later testified at trial that she went upstairs to put on shoes, and, at that time, she told Mr. Moore that the police were asking for him. Mr. Moore eventually came downstairs, walked outside, and surrendered; according to Deputy Marshal Midock, he said something like, "You got me, you can go ahead and leave now." At trial, Ms. Conley testified that she exited the house again after Mr. Moore and that she was handcuffed, after which Mr. Moore protested something like, "[Y]ou guys got me, you don't need to handcuff her. Let her go. She don't have anything to do with this, y'all got me." Deputy Marshal Midock did not testify to whether Ms. Conley had been put in handcuffs, instead stating that he continued speaking with her.

After some additional time, Mr. Stewart then came out of the house. Not knowing who he was, officers from the task force handcuffed him as a safety measure. There is some factual dispute about whether officers reached into the house to detain Mr. Stewart or whether he was already outside when they detained him.

Taking Ms. Conley away from Messrs. Moore and Stewart and stepping into the house, Deputy Marshal Midock confirmed that she was a lessee of the house and asked for her permission to conduct a protective sweep. Ms. Conley asked to call her mother, to which Deputy Marshal Midock agreed. Ms. Conley testified at trial that, by this point, she was no longer in handcuffs. She spoke with her mother and then passed the phone to Deputy Marshal Midock, who spoke with Ms. Conley's mother briefly before she hung up on him. Deputy Marshal Midock testified that Ms. Conley consented to a search of the house following the call.

Officers then began a search of "any area of the house that could hide a person." Deputy Marshal Midock joined the search of the second floor. He went into the spare bedroom, opened the closet, and found a shotgun. Other officers found "some type of powder or some type of package of powder" in a bag "sitting in the dining room area." Deputy Marshal Midock testified that the contents of the bag were visible without disturbing the bag.

Deputy Marshal Midock testified that the task force determined that Mr. Stewart had no active warrants and released him some time after they discovered the shotgun and powder. Ms. Conley's testimony at trial contradicted that account, stating that both she and Mr. Stewart had been released from handcuffs before Deputy Marshal Midock asked for her consent to search.

After discovering the shotgun and powder, Deputy Marshal Midock contacted FBI agents, who in turn applied for a search warrant. A search of the house uncovered the AR-15 in a closet beside the front door and the handguns in the kitchen cupboard, as well as additional contraband.

## II.  PROCEDURAL BACKGROUND

In January 2017, a grand jury returned a seven-count indictment charging Messrs. Stewart and Moore with four drug-trafficking offenses: possession with intent to distribute methamphetamine, cocaine, and cocaine base and knowing possession of firearms in furtherance of drug trafficking crimes. Counts 5, 6, and 7 respectively charged each of Messrs. Moore, Stewart, and Cousins individually with possession of a firearm having been previously convicted of a felony— Messrs. Moore and Stewart with the two handguns in the cabinet in the Dartmouth house, and Mr. Cousins with the AR-15 and shotgun.

Ms. Conley and Mr. Richardson-Fields were also charged with maintaining a drug premises. Their charges were dismissed without prejudice, and the government relocated them and gave them financial assistance.

**A.  Mr. Moore's Motion to Suppress and Guilty Plea**

Although Mr. Moore was already retained in custody, Mr. Stewart was not arrested until October 2017, so he was not represented at Mr. Moore's suppression hearing in May 2017. At that hearing, Deputy Marshal Midock was the only witness to testify; his testimony is summarized in section I.C above. The district court denied Mr. Moore's motion, finding that Ms. Conley had validly consented to a protective sweep of the Dartmouth house, that the shotgun was in plain view during that search, and that the search warrant later obtained by the FBI was valid. In November 2017, Mr. Moore pleaded guilty to counts 1 through 4 of the indictment in exchange for a sentencing recommendation from the government.

**B.  Mr. Stewart's Motion to Suppress**

Mr. Stewart filed his first motion to suppress in November 2017. In that motion, he argued that the officers had "no articulable basis on which to support a reasonable suspicion of danger from inside the home that would constitutionally justify a protective sweep." He also argued that Ms. Conley's consent was not voluntary because she "was young, nervous, handcuffed and alone in the residence with police officers." He filed a second motion to suppress in March 2018, again asserting that Ms. Conley was handcuffed when she purportedly gave consent. The government responded that Mr. Stewart had "not raised any additional issues" beyond those considered at the hearing on Mr. Moore's motion.

The court heard argument on Mr. Stewart's suppression motion in August 2018. The government contended that Mr. Stewart presented "essentially the same issues" as Mr. Moore had. And Mr. Stewart's counsel agreed on the record four separate times that he had nothing new to add. The court denied the motion but indicated that it would be open to reconsideration if new evidence arose.

After obtaining new counsel, Mr. Stewart moved to reopen the suppression hearing in September 2018. He contended that certain arguments "were not presented or were neglected by defense counsel for Mr. Moore during the initial suppression hearing" and that "the Court was left with a defective record" in part because Ms. Conley had not testified. In November 2018, Mr. Stewart filed a supplemental brief in support of his motion. Besides reiterating the need for additional testimony, he asserted that he twice told officers they could not go into the Dartmouth house. Mr. Stewart also attached affidavits from himself and Mr. Cousins declaring that Mr. Stewart and Ms. Conley had denied officers permission to search the house.

In December 2018, before trial began, the court addressed Mr. Stewart's renewed motion. The court asked his new counsel: "[Y]ou wanted to have a hearing on your motion to suppress. I'm not quite sure; I read your motion, but there was a consensual search of the premises. Do you have something that's going to change that?" His counsel responded: "No, Your Honor. I stand by the brief." The court responded that it would "listen during the course of the trial, too, if there's something that would change the decision." It issued a marginal order that day, stating: "Def[endant] to rely on written motion. At this point, there is no reason to reopen suppression hearing. Court to listen to all testimony in the trial on issue of search."

## C. Mr. Cousins's Motion for Relief from Misjoinder

Mr. Cousins filed a Rule 8 motion for relief from misjoinder in November 2018. He argued that count 7, charging him with possession of an AR-15 rifle and a shotgun—the only charge against him—was improperly joined with the charges against Messrs. Moore and Stewart. The district court denied Mr. Cousins's motion off the record in chambers. Mr. Cousins did not file a Rule 14 motion for severance.

**D. Trial and Afterward**

After the close of evidence but before jury instructions and closing arguments, Mr. Stewart again asked the court to revisit the warrantless search. The court declined to change its ruling, stating that it was "not quite sure whether" Mr. Stewart had an expectation of privacy in the Dartmouth house because the occupant of the home at the time was Ms. Conley. The court also recounted that Ms. Conley had testified that "she made the decision to give consent to the search," which "kind of ends" the analysis.

The jury found Messrs. Cousins and Stewart guilty of all the charges against them. Afterward, Mr. Stewart filed a motion for a new trial, arguing in part that the district court had erred in failing to grant him a suppression hearing. During Mr. Stewart's sentencing hearing, the court denied his new-trial motion, observing that "all three of [his] lawyers filed to have an additional motion to suppress," but upon being asked if they had additional evidence, all of them answered in the negative.

The court sentenced Mr. Cousins to 72 months of imprisonment and Mr. Stewart to 220 months. They now appeal.

**II. ANALYSIS**

**A. Jason Cousins**

Mr. Cousins challenges his indictment as defective under Federal Rule of Criminal Procedure 8; he also challenges the district court's refusal to grant severance of his single charge under Rule 14.[1] "Although the remedy for misjoinder under Rule 8[] and prejudicial joinder under Rule 14 is the same—severance and separate trials—the two rules are analytically and procedurally

---

[1] Mr. Cousins's brief claims that the district court "abused its discretion and denied [him] his right to Due Process of Law" under the Constitution. The subsequent arguments, however, are grounded only in Rules 8 and 14, not due process, so we construe his claims as under those rules instead.

distinct." *United States v. Lloyd*, 10 F.3d 1197, 1214 (6th Cir. 1993). Rule 8 governs when an indictment properly charges multiple counts or defendants, and Rule 14 allows a court to order severance of properly joined charges or defendants to relieve a party of potential prejudice. *Ibid.*

Because Mr. Cousins moved for relief from misjoinder under Rule 8 before trial, we review the district court's denial de novo but also for harmless error. *United States v. Hatcher*, 680 F.2d 438, 440–42 (6th Cir. 1982).[2] His pretrial motion did not cite Rule 14, and he made no other motions for severance during trial. We would thus review his Rule 14 claim for plain error, but we need not do so because his count should have been severed under Rule 8(b) and the error was not harmless. *Lloyd*, 10 F.3d at 1215.

Joinder of multiple defendants is proper only if "they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). Acts or transactions form a "series" if they are "logically interrelated"—for example, if they are "part of a common scheme or plan." *United States v. Beverly*, 369 F.3d 516, 533 (6th Cir. 2004). In keeping with the purpose of joinder—to promote judicial economy—we also find a set of acts or transactions to form a series if they "involve substantially overlapping evidence that will permit joint proof at trial." Andrew D. Leipold, 1A *Wright & Miller's Federal Practice & Procedure* § 145 (5th ed. 2020); *see also United States v. Frost*, 125 F.3d 346, 390 (6th Cir. 1997) ("[T]he primary purpose of this kind of joinder is to insure that a given transaction need only be proved once."). One specific consideration along this line is whether

---

[2] Mr. Cousins's brief incorrectly states that we review the district court's refusal to sever under Rule 8 for abuse of discretion, citing *United States v. Carnes*, 309 F.3d 950 (6th Cir. 2002) and *United States v. Hang Le-Thy Tran*, 433 F.3d 472 (6th Cir. 2006). (To its credit, the government cites the correct standard in its brief.) Although *Carnes* said we review a denial of severance for abuse of discretion, its analysis in that case matches more closely with de novo review. 309 F.3d at 957. It found that the misjoined count was not of a "similar character" to the other two counts or "based on a common scheme or plan," both phrases drawn from the text of Rule 8(a), and it did not refer to the district court's discretion at all. *Id.* at 958. In any case, *Hatcher* precedes *Carnes*, so *Hatcher*'s statement of the standard of review trumps. 6 Cir. R. 32.1(b). As for *Hang Le-Thy Tran*, the court there reviewed only the district court's refusal to grant severance under Rule 14 for an abuse of discretion. 433 F.3d at 477–78.

"testimony was admissible against all of the defendants"; if so, that weighs in favor of joinder. *Beverly*, 369 F.3d at 533. On the other hand, Rule 8 is a pleading rule: We examine only "the allegations on the face of the indictment," not the proofs at trial, to determine whether Rule 8 permits joinder. *See Thomas v. United States*, 849 F.3d 669, 675 (6th Cir. 2017).

In this case, the face of the indictment gives no indication that Mr. Cousins's charge forms part of the same "act or transaction" or the "same series of acts or transactions" as the other charges, as Rule 8(b) requires. Unlike many drug-conspiracy indictments, this indictment does not contain a statement of alleged facts before the list of counts; it merely states the counts that each defendant is charged with. It charges both Mr. Stewart and Mr. Moore with possession with intent to distribute certain drugs in each of counts 1 through 3, and it charges them both in count 4 with possession of two handguns in furtherance of drug-trafficking crimes. Count 5 then charges Mr. Moore specifically with possessing those same two handguns (identified by the same serial numbers as in count 4) while a felon, and count 6 charges Mr. Stewart specifically with possessing the same two handguns (again, identified by the same serial numbers) while a felon. Because Mr. Moore and Mr. Stewart are charged with possessing the same drugs and guns, we readily infer a logical relationship among the first six counts of the indictment. Moreover, proof of each act of possession would necessarily overlap because the acts charged are possession of the same objects—especially the guns, which are identified by the same serial numbers.

By contrast, the indictment contains nothing readily connecting the single count charging Mr. Cousins with any of the other six. The guns listed in count 7 (an AR-15 and a shotgun) are different from the handguns in counts 4 through 6. There is no allegation that Mr. Cousins possessed these firearms in furtherance of any drug-trafficking scheme, let alone the same one Mr.

Moore and Mr. Stewart were charged with. Nor is there any allegation that the guns were found in the same location.

Although the government argues that joinder was appropriate because the offenses "grew out of the same search," the three defendants "simultaneously stored guns" at the Dartmouth house, and "[t]he government's witnesses regarding the basis for the search, and the search itself, would be the same in separate trials," there is no basis for any of those conclusions in the charging instrument. The only connection apparent from the indictment is that the offenses are all alleged to have occurred "[o]n or about November 17, 2016." Although we construe indictments "in favor of joinder," *United States v. Chavis*, 296 F.3d 450, 456 (6th Cir. 2002), without knowing additional facts about the search and witnesses, we cannot infer from the coincidence in date that count 7 is related to the first six counts or that the proofs will involve common evidence. We conclude that count 7 is misjoined.

Having found error, we now determine whether it was harmless. Contrary to the government's protestations, Mr. Cousins does not bear the burden of proving prejudice. Rather, the government must "demonstrat[e] that an error is harmless under Rule 52(a)." *Chavis*, 296 F.3d at 461. Error from misjoinder is harmful if it "results in actual prejudice because it 'had substantial and injurious effect or influence in determining the jury's verdict.'" *United States v. Lane*, 474 U.S. 438, 449 (1986) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). Factors indicating harmlessness include "overwhelming evidence of guilt, the fact that limiting instructions were given to the jury, and the fact that evidence concerning the misjoined counts would have been admissible in separate trials absent joinder." *Chavis*, 296 F.3d at 461.

Here, the evidence against Mr. Cousins is far from "overwhelming," and the government does not so argue. There was no physical evidence connecting him with the firearms—only testimony from Mr. Moore, Ms. Conley, and Mr. Richardson-Fields, all of whom received substantial benefits from the government. Mr. Moore was not present at the purported "argument" at Roe's house; his only evidence against Mr. Cousins is his testimony that Mr. Cousins at one point handled the handguns in the cabinet—guns he is not even charged with possessing. And Ms. Conley and Mr. Richardson-Fields both confirmed that Roe's living room, where the purported phone argument between Roe and Mr. Cousins took place, was "noisy," whether from others talking or from the television. There were also inconsistencies in their accounts: They disagreed about whether Roe was actually present in the room, whether others were acting as go-betweens in Roe's and Mr. Cousins's conversation, and whether Mr. Richardson-Fields was the only one to touch the shotgun and AR-15 at Roe's house. Last, both confirmed that Mr. Cousins never followed up with them about the guns, even though Ms. Conley testified that he came to the Dartmouth house at some point after the argument.

The second factor we consider is the limiting instructions the district court gave the jury. We presume that juries are "capable of following instructions" about "the sorting of evidence and the separate consideration of multiple defendants." *United States v. Walls*, 293 F.3d 959, 966 (6th Cir. 2002). We also consider how specific the limiting instructions are and when the court gave them to the jury in determining whether they effectively dispelled prejudice from misjoinder. *Compare, e.g.*, *Lane*, 474 U.S. at 450 (finding error harmless in part because trial court "provided a proper limiting instruction" when evidence on misjoined count was introduced and "in the final charge repeated that instruction and admonished the jury to consider each count and defendant

separately"), *with United States v. Shellef*, 507 F.3d 82, 101–02 (2d Cir. 2007) (finding error harmful in part because trial court failed to give limiting instructions about use of particular evidence).

Here, the court gave limiting instructions at the start of voir dire, explaining that the charges against the defendants were to be evaluated separately. It did not give limiting instructions before, during, or shortly after testimony which hinted at Mr. Cousins's involvement in the drug-trafficking operation, when the implication would have been most salient in the jury's mind and more easily corrected. The court reiterated its limiting instructions during its charge to the jury, given before closing arguments. But those instructions did not specifically direct the jury not to consider evidence of Mr. Stewart's drug-trafficking—or evidence tending to implicate Mr. Cousins in the drug ring—as having any bearing on Mr. Cousins's gun-possession charge. *See Lane*, 474 U.S. at 450 n.13 ("Indeed, this Court's conclusion in *Schaffer* that defendants failed to show prejudice was based directly on the fact that 'the judge was acutely aware of the possibility of prejudice and was strict in his charge—not only as to the testimony the jury was not to consider, but also as to that evidence which was available in the consideration of the guilt of each [defendant] separately under the respective substantive counts.'" (alteration in original) (quoting *Schaffer v. United States*, 362 U.S. 511, 516 (1960))). Nor did the court issue any limiting instructions during its admonition after closing arguments.

Indeed, the government's presentation of its case ran counter to the district court's limiting instructions. It made numerous attempts to connect Mr. Cousins with Messrs. Moore and Stewart's drug-trafficking operation even though Mr. Cousins was not on trial for any drug-related offense. The government wove the offenses into a single narrative in its opening statement.[3] It elicited

---

[3]  Mr. Stewart and Mr. Cousins are convicted felons, and on November 17 of 2016 they both possessed multiple firearms and ammunition at a residence down in Canton, Ohio. And Maurice Stewart was operating a drug trafficking operation out of that residence

testimony from Mr. Moore that, about three or four days before the task force came to the house, Mr. Cousins was at the house, wearing one of the handguns found in the kitchen—the guns it took pains to connect to the drugs—even though Mr. Cousins was not charged with possessing either handgun. The government also elicited testimony from Mr. Richardson-Fields that Mr. Cousins instructed Mr. Stewart to send Mr. Richardson-Fields to deliver heroin to Mr. Cousins's uncle. And even though, on redirect, the court sustained two objections from Mr. Cousins as to testimony to that effect, the court did not give the jury limiting instructions concerning that testimony.

Other evidence the government introduced to tie Mr. Cousins to the drug ring included Canton police officer Michael Volpe's testimony that "drugs and guns go together"; his testimony that the presence of a bulletproof vest like the one brought into the house along with the AR-15 and shotgun indicates that its owner would "have more connections to get certain things than normal drug trafficking organizations that [Officer Volpe had] dealt with"; his testimony tying five cell phones and "a piece of paper with the moniker Flam" (Mr. Cousins's nickname) and a cell-phone number with his experience that he "ha[s]n't investigated a drug trafficking organization that hasn't used multiple cell phones to conduct the drug trafficking business"; and his testimony that Mr. Cousins "was paying for everyone's attorneys." The government continued to portray Mr. Cousins as not just a member but a leader of the drug conspiracy in closing argument and again in rebuttal.

---

in Canton, Ohio, and at that time and on that date he was in possession of all the tools of the trade of drug trafficking[.] . . . .

. . . .

You are going to learn in this case that I mentioned he had the *tools of the trade of drug trafficking* in that residence, and you're going to learn that two 19-year-old kids at that time were also *tools of the trade for Mr. Stewart and for Mr. Cousins in this case*.

(emphasis added)

The government actively worked against the court's limiting instructions throughout trial. So even though we would normally presume that those instructions were sufficient to dispel any unfair prejudice against Mr. Cousins, here that presumption is rebutted.

Last, if the evidence against Mr. Stewart would likely have been admissible in a separate trial on the charge against Mr. Cousins, then the error is more likely harmless. *Lane*, 474 U.S. at 450 & n.13. But if that evidence would likely not be admissible, especially under Federal Rule of Evidence 403, then there is more likely an injurious prejudicial effect on the verdict. *Shellef*, 507 F.3d at 101. Here, much of the evidence against Mr. Stewart introduced during trial would likely be inadmissible against Mr. Cousins in a separate proceeding. Indeed, much of the evidence discussed above is irrelevant to Mr. Cousins's gun charge. *See* Fed. R. Evid. 401. And much of it is significantly more unfairly prejudicial to him than probative of the gun charge. *See* Fed. R. Evid. 403. It would likely lead a juror to convict on the gun charge based on his possible (but uncharged) involvement with drug trafficking, especially combined with the government's closing arguments. And with the lack of specific, curative instructions to the jury after that evidence was introduced, its potential to have an injurious prejudicial effect on the jury's verdict is apparent.

The government has failed to prove by a preponderance of the evidence that the misjoinder of Mr. Cousins with the other defendants was harmless. We therefore vacate Mr. Cousins's conviction.

### B.  Maurice Stewart

Mr. Stewart raises several issues on appeal. Because the government does not contest that Mr. Stewart had standing to challenge the search of the Dartmouth house, we assume so without deciding the issue. And because we find the search reasonable regardless of whether Ms. Conley validly consented, we decline to reach that issue. We address his remaining issues in turn.

*1. Alleged Lack of Suppression Hearing*

First, Mr. Stewart argues that the district court "constitutionally erred" by failing to hold a suppression hearing on his motions to suppress evidence. He also cites Federal Rule of Criminal Procedure 12(d), which states that "[t]he court must decide every pretrial motion before trial unless it finds good cause to defer a ruling" and that it "must not defer ruling on a pretrial motion if the deferral will adversely affect a party's right to appeal." After reviewing the record, we find no error.

Mr. Stewart moved in November 2017 and again in March 2018 to suppress the evidence from the Dartmouth house search. The district court held a hearing in August, well before trial. At that hearing, Mr. Stewart's counsel affirmed four separate times that there was no new evidence beyond that presented at Mr. Moore's suppression hearing. He also stated that he would not have Mr. Stewart testify. The court accordingly rendered the same decision as it did on Mr. Moore's earlier motion, which was based on the same facts. Mr. Stewart later moved to reopen the suppression hearing. After his counsel continued to state he had nothing new to present to change the court's mind about Ms. Conley's consent, the court declined to reopen the hearing, stating that it would instead listen to trial testimony to see if anything led it to reconsider the motion to suppress.

Because the court decided Mr. Stewart's motions to suppress before trial, it satisfied its obligation under Rule 12(d). And there was no constitutional violation. Mr. Stewart was present at the hearing and represented by counsel. He had the opportunity to testify there, out of the jury's presence—his counsel at the time recognized that opportunity and made a conscious decision to forgo it. Although Mr. Stewart claims he was denied a chance to cross-examine Deputy Marshal Midock about Ms. Conley's consent, he could have called the deputy marshal himself at his own

suppression hearing. And Mr. Stewart fails to cite any particular violation of due process. His arguments are meritless.[4]

### 2. *Alleged Entry of Dartmouth House Without Arrest Warrant*

Mr. Stewart next argues that he "was peaceably moving about a home where he had been a guest staying overnight" when police "entered the home, forcibly removed him, and de facto arrested him" without an arrest warrant. The government responds that "Stewart was not 'arrested' inside of the residence. Rather, Stewart walked downstairs, 'came right to the door,' and was temporarily detained for safety reasons before being released."

Even if officers entered the house to detain him and violated the Fourth Amendment by doing so, suppression is not the correct remedy. As the government points out, "the authorities gained no evidentiary value from briefly detaining and then releasing Stewart." The officers' brief intrusion into the house, if it indeed happened, did not turn up evidence that the government later relied on to justify the later protective sweep. *See Segura v. United States*, 468 U.S. 796, 815 (1984) ("The illegal entry into petitioners' apartment did not contribute in any way to discovery of the evidence seized under the warrant; it is clear, therefore, that not even the threshold 'but for' requirement was met in this case.").

### 3. *The Protective Sweep*

Mr. Stewart next challenges the constitutionality of the warrantless search of the Dartmouth house. "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. The Fourth

---

[4] Although Mr. Stewart strongly objects to the district court's decision to consider trial testimony rather than reopen the suppression hearing, he wrongly characterizes that decision as a denial of any suppression hearing whatsoever. And because he failed to challenge the denial of his motion to reopen the suppression hearing in his opening brief, instead standing on his unfounded assertion that he was denied a hearing altogether, we deem that issue waived. *Sanborn v. Parker*, 629 F.3d 554, 579 (6th Cir. 2010).

Amendment does not bar all warrantless searches but only unreasonable ones. *Maryland v. Buie*, 494 U.S. 325, 331 (1990). To determine reasonableness, we "balance[] the intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Ibid.* (collecting cases).

Although a search of a home generally requires a warrant in order to be reasonable, there are exceptions. *Ibid.* As "an incident to [an] arrest," officers may "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id.* at 334. And if there are "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that [an area in the home] harbors an individual posing a danger to those on the arrest scene," then an officer is justified in a "cursory inspection of those spaces where a person may be found." *Id.* at 335. Moreover, an officer may seize an item found during such a protective sweep if "(1) the officer did not violate the Fourth Amendment in arriving at the place where the evidence could be plainly viewed, (2) the item is in plain view, and (3) the incriminating character of the evidence is readily apparent." *United States v. Taylor*, 248 F.3d 506, 512 (6th Cir. 2001) (citing *Horton v. California*, 496 U.S. 128, 136 (1990)).

The district court denied Mr. Stewart's motion to suppress. We review any findings of fact by the district court for clear error and its legal conclusions de novo. *United States v. Gilbert*, 952 F.3d 759, 762 (6th Cir. 2020). In our review, we may consider evidence offered at any suppression hearing as well as evidence presented at trial. *United States v. Hinojosa*, 606 F.3d 875, 880 (6th Cir. 2010). But because the district court denied the suppression motion, we must view the evidence in the light most favorable to the government. *Gilbert*, 952 F.3d at 762.

Here, the task force at the Dartmouth house had a reasonable, articulable, particularized suspicion warranting a belief that the house would harbor someone dangerous to the officers. That Mr. Moore lived there and was wanted on gun and drug charges increased the likelihood that firearms would be inside, increasing the chance of danger. It also raised the reasonable suspicion that others might be inside if Mr. Moore were continuing his drug-trafficking activities.

The task force saw two rental cars outside the house—a red flag for Deputy Marshal Midock, who knew that drug traffickers frequently used rental cars. The presence of more than one car also indicated that there were likely others in the house besides Mr. Moore—others who could use those likely-present firearms. *See United States v. Stover*, 474 F.3d 904, 910–12 (6th Cir. 2007) (presence of multiple vehicles contributed to reasonable suspicion justifying protective sweep).

Mr. Richardson-Fields's refusal to answer questions about whether others, including Mr. Moore, were in the house or whether guns were in the house would also reasonably arouse suspicion that indeed both were true. One officer also reported seeing a person through the second-story window. Because that person was identified neither as Mr. Moore nor later as Mr. Stewart when he emerged, seeing the unidentified male in the window also raised suspicion that others besides those two were in the house. *See United States v. Beasley*, 199 F. App'x 418, 423 (6th Cir. 2006) (observation of person in window of hotel room where defendant was believed to be staying contributed to reasonable suspicion justifying protective sweep of room).

Then, when Ms. Conley came to the front door, she was "extremely nervous" and "evasive," not answering Deputy Marshal Midock's questions. *See Taylor*, 248 F.3d at 514 (nervousness of other occupants contributed to reasonable suspicion justifying protective sweep). When Mr. Moore finally appeared at the door, he told the officers something to the effect of, "You got

me, you can go ahead and leave now," raising a red flag for Deputy Marshal Midock that something suspicious was going on inside.[5] Ms. Conley continued to appear nervous and evasive, even after both Mr. Moore and Mr. Stewart had been taken into custody downstairs, which a reasonable officer could construe as a sign that perhaps more people were present. And given that Mr. Moore was wanted for guns and drugs, it was likely that, whatever was going on inside, it involved firearms. So the officers could reasonably believe that anyone still inside posed a danger to them.

All these facts, taken together, are sufficient for a reasonable, prudent officer to suspect the presence of others inside the house who could pose a threat. And that is enough for a protective sweep of the entire house. *See United States v. Crail*, 553 F. App'x 540 (6th Cir. 2014) (combination of multiple factors, including presence of rental car, appearance of movement in house, and length of officers' wait at the house, justified protective sweep).

The dissent argues that this case is more analogous to *United States v. Archibald*, 589 F.3d 289 (6th Cir. 2009). There, one officer started knocking on the front door of a building believed to house a suspect, while other officers positioned themselves to cover the officer at the door. *Id.* at 291. The officer "knocked on the door repeatedly and heard movement inside the residence," but "no one came to the door or gave a verbal response" for several minutes. *Id.* at 292. After that delay, the officer at the door heard a male voice behind the door say, "[w]ho is it?" *Ibid.* (alteration in original). After the officer identified himself and requested the defendant "come to the door," the officer heard no verbal response but instead "shuffling sounds" from inside. *Ibid.* That continued for some time before the defendant opened the door and officers arrested him. *Id.* at 292–93.

---

[5] As outlined in section I.C, there is conflict between Deputy Marshal Midock's testimony at Mr. Moore's suppression hearing and Ms. Conley's testimony at trial. Ms. Conley characterized Mr. Moore's statement as protesting her being handcuffed; Deputy Marshal Midock's testimony paints it instead as an attempt to get the officers to leave the house. Because we review the evidence in the light most favorable to the government, we must accept Deputy Marshal Midock's version of events over Ms. Conley's.

Two officers then entered the apartment and "conducted a short protective sweep" that revealed the presence of "narcotic contraband." *Id.* at 293. We found that the protective sweep was unjustified because the "record contain[ed] no evidence, circumstantial or otherwise, of the presence of a dangerous third party" in the defendant's residence. *Id.* at 299.

This case differs from *Archibald*. In that case, there were only shuffling sounds and a single male voice to justify the protective sweep. Here, there were more-than-adequate reasons to suspect others were in the house. The officers had seen two rental cars at the house in a city where drug-traffickers often used rental cars. Mr. Richardson-Fields, after being stopped, refused to say whether firearms were in the house. Deputy Marshal Midock testified that Mr. Moore had essentially proclaimed, "Nothing to see here!" to the officers in an apparent ploy to protect others who might be present. And another person—Mr. Stewart—came out of the house after Mr. Moore's statement. The officers had seen an unknown male in the second-story window earlier—and did not match that person to either Mr. Moore or Mr. Stewart after the two had left the house. And even after both Messrs. Moore *and* Stewart had come outside, Ms. Conley continued to act with the same nervousness as before they had emerged. An officer could reasonably suspect that she was trying to cover up for—or was scared of—others still inside. These articulable facts, not present in *Archibald*, are enough to create reasonable suspicion that someone else was in the Dartmouth house.

### 4. Rehaif *Challenges*

Mr. Stewart also launches a barrage of challenges based on *Rehaif v. United States*, in which the Supreme Court held that "in a prosecution under 18 U.S.C. § 922(g) and § 924(a)(2), the Government must prove both that the defendant knew he possessed a firearm and that he knew

he belonged to the relevant category of persons barred from possessing a firearm." 139 S. Ct. 2191, 2200 (2019). Binding circuit precedent precludes them all.

Mr. Stewart first argues that "the grand jury failed to charge an offense in count six." Count 6 states:

> On or about November 17, 2016, in the Northern District of Ohio, Eastern Division, MAURICE A. STEWART, having been previously convicted of a crime punishable by imprisonment for a term exceeding one year . . . , did knowingly possess firearms . . . and ammunition, said firearms and ammunition having been shipped and transported in interstate and foreign commerce, in violation of Title 18, United States Code, Section 922(g)(l), and Title 18, United States Code, Section 2.

Mr. Stewart asserts that the count does not state an offense "because defendant's knowledge that he was a felon and thus prohibited from possessing the firearm is an essential element of the offense."

Mr. Stewart did not argue below that the allegations in count 6 were insufficient to charge an offense, so we review his claim for plain error. *United States v. Howard*, 947 F.3d 936, 942 (6th Cir. 2020). Moreover, because he did not challenge the indictment below, we construe it "liberally in favor of its sufficiency." *United States v. Olive*, 804 F.3d 747, 752 (6th Cir. 2015) (quoting *United States v. Gibson*, 409 F.3d 325, 331 (6th Cir. 2005)).

We recently considered and rejected an argument identical to Mr. Stewart's in a separate case. In *United States v. Ward*, the defendant, also relying on *Rehaif*, argued "that the indictment failed to properly charge a violation of 18 U.S.C. § 922(g) because it did not include a knowledge-of-status element." 957 F.3d 691, 694 (6th Cir. 2020). We explained that "the requirement that an indictment allege all of the elements of the offense charged . . . seeks primarily to ensure that an accused is reasonably informed of the charge made against him so that he can prepare a defense." *Ibid.* (alteration in original) (quoting *United States v. Cor-Bon Custom Bullet Co.*, 287 F.3d 576, 580 (6th Cir. 2002)). We reasoned that "'no contemporaneous evidence suggests that' Ward was

unable to present an adequate defense or was otherwise not put on notice of the crime that he was charged of committing." *Ibid.* (quoting *United States v. Hobbs*, 953 F.3d 853, 857 (6th Cir. 2020)). And we concluded that nothing "indicates that 'the indictment cannot within reason be construed to charge a crime.'" *Ibid.* (quoting *United States v. Gatewood*, 173 F.3d 983, 986 (6th Cir. 1999)). We likewise find no plain error in the indictment here.

Second, Mr. Stewart argues that "the jury was not instructed on all elements of the intended offense"—specifically, that the court omitted the knowledge-of-status element. Mr. Stewart did not challenge the jury instructions below, so we again review for plain error. *United States v. Harvey*, 653 F.3d 388, 395 (6th Cir. 2011). *Ward* controls here as well. There, we concluded that, on plain-error review, if "there is clear evidence in the record from which to infer that the defendant knew he was a felon, failure to instruct the jury does not affect the defendant's substantial rights or the fairness or integrity of the proceedings." 957 F.3d at 695.

Here, the indictment states that Mr. Stewart was "previously convicted of a crime punishable by imprisonment for a term exceeding one year," specifically, involuntary manslaughter. He was incarcerated in April 2002 and released in October 2013. Thus, as in *Ward*, "the record 'reveals no reason to think that the government would have had any difficulty at all in offering overwhelming proof that [Mr. Stewart] knew that he' was a felon." 957 F.3d at 695 (quoting *United States v. Burghardt*, 939 F.3d 397, 404 (1st Cir. 2019)). And he does not argue otherwise. The jury instructions were not plainly erroneous.

Last, Mr. Stewart contends that the evidence was insufficient to support the verdict because "the government failed to prove that Stewart knew he was in a class of persons barred from possessing a firearm." But his argument presses a different point: "He did not stipulate, the jury was not instructed to find, and the jury did not make a finding that he had knowledge that conviction

meant he could not legally possess a firearm." Again, *Ward* controls. To convict under 18 U.S.C. § 922(g)(1), "the government must prove beyond a reasonable doubt that: (1) the defendant was a felon; (2) the defendant knew he was a felon (from *Rehaif*); (3) the defendant knowingly possessed a firearm; and (4) that the firearm had traveled through interstate commerce." 957 F.3d at 696. It is not an element that the defendant knew he was barred from possessing a firearm—only that he knew he was a member of the relevant group. Being based on a flawed premise, Mr. Stewart's challenge thus fails.

### III.  CONCLUSION

For the reasons above, we vacate the district court's judgment as to Mr. Cousins and remand for his separate retrial on count 7, and we affirm its judgment as to Mr. Stewart.

WHITE, Circuit Judge, concurring in part and dissenting in part. I join in the majority's discussion and disposition of Cousins' misjoinder claim and Stewart's Rule 12(d) and *Rehaif* arguments. I disagree, however, with the majority's conclusion that the warrantless search was justified by *Maryland v. Buie*'s "protective sweep" exception. 494 U.S. 325 (1990). In situations like this one—where the police have already arrested their suspect outside of a home—protective sweeps are allowed only if the officers can point to specific, articulable facts that another dangerous person may still be inside the home. In large part, the majority suggests that the government makes this showing because the police did not know if anyone remained in the home. But lack of knowledge does not justify this type of sweep. *United States v. Archibald*, 589 F.3d 289, 300 (6th Cir. 2009); *United States v. Colbert*, 76 F.3d 773, 778 (6th Cir. 1996).

## I. Factual Background

In January 2017, a grand jury returned an indictment charging Defendant Maurice Stewart and William Moore[1] with possession with intent to distribute methamphetamine (count one); possession with intent to distribute cocaine (count two); possession with intent to distribute cocaine base (count three); and knowing possession of a Glock model 23 handgun and a Smith and Wesson SD9 handgun in furtherance of drug trafficking crimes (count four). Counts five, six, and seven, charged Moore, Stewart, and Defendant Jason Cousins respectively with knowing possession of firearms having been previously convicted of crimes punishable by imprisonment for a term exceeding one year. As relevant here, in count seven, Cousins was individually charged with possessing "a Windham Weaponry AR-15 rifle" and "a Mossberg 12 gauge shotgun." R. 1, PID 4.

---

[1] Moore pleaded guilty and testified at trial pursuant to an agreement with the government. He is occasionally referred to in the record by his nickname, "Chill."

**A. Moore's Motion to Suppress**

On March 28, 2017, Moore filed a motion to suppress evidence seized after his arrest. On May 2, the court held a hearing on Moore's motion. Deputy U.S. Marshal Eric Midock was the only witness to testify. He stated that on November 16, 2016, he received notification of a West Virginia arrest warrant for Moore and information that Moore was staying with Markianna Conley at a home on Dartmouth Avenue in Canton, Ohio (the Residence). Midock reviewed Moore's criminal history and immediately began surveilling the Residence. Midock testified that he spoke to a neighbor who recognized a photo of Conley and stated that a man resembling Moore was also staying at the Residence. Midock surveilled the Residence again the following morning and saw two rental cars in the driveway. According to Midock, "people who are selling drugs tend to rent cars." R. 33 PID 129. Midock then observed someone leave the Residence and drive away in one of the rental cars. Midock followed the car, and although there had been no traffic violation, he "effected a traffic stop on it." *Id.* at 130, 154. The driver was Willie Richardson-Fields, later identified as Conley's boyfriend. According to Midock, Richardson-Fields refused to answer whether Moore was in the Residence or whether any firearms were present. Finding no warrants for Richardson-Fields, Midock released him.

Concerned that Richardson-Fields would alert others of the police presence, Midock requested fellow officers to set up a perimeter around the Residence. According to Midock, one of these officers reported via radio that "a black male . . . looked out of the window" of the second floor. *Id.* at 133. Midock heard another officer report that the front door was open but "a female walked up to that door and closed it." *Id.* at 133-34. Returning from the traffic stop, Midock approached the front door of the Residence and knocked. Two other officers were standing with Midock with their weapons drawn, "covering" the first-floor windows. *Id.* at 135-36. Conley

answered the door and Midock asked if Moore was in the Residence. According to Midock, Conley was evasive and nervous and did not answer the question. Midock then observed Moore walk down the stairs toward the front door: "He approaches us. I kind of turn him around, grab his hands. I move him onto the porch and put him against the wall, the side of the house. My task force officers handcuff him at that point, and I'm still dealing with [Conley] at the front door there." *Id.* at 136. Midock testified that Moore then said something to the effect of, "You got me, you can go ahead and leave now." *Id.* at 137. Regarding Conley, Midock testified:

> I'm standing in a doorway and, you know, it's just – it's a place where you don't really want to spend too much time if you don't have to, but something about her actions, her nervousness, her evasiveness, it made me want to question her as to whether there were any other people in her home. . . . I got the same answer, if you will, basically no answer, and that she was unsure if anybody else was in the house, but she didn't say yes or no specifically.

*Id.* at 137. Midock testified that at that point he did not perceive any threats and the goal of arresting Moore had been accomplished. Shortly thereafter, Midock observed a man, later identified as Maurice Stewart, come down the stairs:

> A. [H]e came right to the door and we brought him out and we put a pair of handcuffs on him, and we basically in the same manner as which I handled Mr. Moore, I kind of passed him back. They put handcuffs on him, and I want to say they sat him on the front porch to try to determine who he was.
> Q. Can you give us—what's the purpose of placing Mr. Stewart in handcuffs when he comes down there? Why do you do that?
> A. Safety reasons. I don't know who he is. I don't know what he could have on his person. We would just want to make sure we're safe and he's safe at that point.

*Id.* at 138. Midock also testified that Stewart "was very, very nice, personable. He had told us that he was just a guest at the house and that he had no ties to it other than knowing the people that lived there. And he repeatedly asked if he could leave . . . ." *Id.* at 174.

Although Midock conceded that he could have spoken with Conley in a police vehicle and been protected, Midock asked Conley for permission to enter the Residence, away from Moore and Stewart: "I don't want them to know the nature of our conversation. You know, that was between her and I at that point in time. And I also don't want them yelling at her or, you know, telling her what to do at that point." *Id.* at 139, 160-61. According to Midock, Conley agreed to speak with him inside. Midock confirmed that Conley was a lessee of the Residence and requested her consent to conduct a protective sweep: "I told her—typically how I describe that is, 'Hey, we want to look through your house to make sure nobody else is in here. We're looking for people, you know, to make sure that there's nobody else that could—could be a threat to us.'" *Id.* at 141. Although Midock believed that "[a]t any point in time, a threat could materialize," he acknowledged that there was no need to go back into the Residence:

> Q. . . . [Y]ou didn't see any threat, correct?
> A. Yeah, we did not see a threat.
> Q. So you haven't seen a threat. You've secured the person you wanted. Why did you need to go back in the house?
> A. I don't know that we necessarily needed to. You know, we just needed to make sure—
> Q. So—let me interrupt you then. So you didn't need to go in the house?
> A. Correct.

*Id.* at 161. Conley asked to call her mother and Midock agreed. Conley spoke with her mother and passed the phone to Midock. Conley's mother hung up on Midock after a brief conversation. Midock testified that Conley consented to a search of the Residence following the call.

Officers then began a search and looked into "any area of the house that could hide a person," clearing the basement, first floor, and second floor. *Id.* at 143-45. Midock joined the search of the second floor: "We went into a bedroom, and in the closet of that bedroom, which I opened the closet, there was a shotgun that was, I believe, the only item in the closet." *Id.* at 146. Officers also found "some type of powder or some type of package of powder" that "was located in a bag,

a bookbag of some sort, sitting in the dining room area." *Id.* at 146-47, 170. According to Midock, "[y]ou could see the powder or the package, the partial package inside of the bookbag from just looking at it." *Id.* at 170. Officers determined Stewart had no active warrants and released him sometime after they discovered the shotgun and powder. After discovering these items, Midock reached out to FBI agents, who in turn applied for a search warrant. FBI agents arrived and searched the Residence as Midock and fellow officers "stood around and answered any questions that they had." *Id.* at 148. Officers found an AR-15 rifle in a closet beside the front door and handguns in a kitchen cupboard, but it is unclear from Midock's testimony if officers discovered these before or after obtaining a warrant.

After summarizing Midock's testimony, the court explained that "there are generally two ways that a protective sweep could be conducted. One is with consent, and another is that based on the totality of the circumstances." *Id.* at 181. The court also noted that "even if a suspect is outside, the residence can be given a protective sweep for the protection of the officers," citing *Maryland v. Buie*, 494 U.S. 325 (1990). *Id.* at 181. The court concluded that "the fact that [Conley] consented kind of ends that analysis under the totality of the circumstances" and that "the protective sweep was appropriate because of the consent given by the lessee." *Id.* at 184. The court also determined that the officers "saw the shotgun in the closet, you open the closet, that is certainly plain view." *Id.* at 184-85. Based on this analysis, the court denied Moore's motion to suppress.

**B. Stewart's Motions to Suppress**

Stewart and his counsel were not present at the hearing on Moore's motion to suppress. Stewart was arrested later, in October 2017. Stewart filed his first motion to suppress on November 27, 2017. In that motion, Stewart argued that the officers had "no articulable basis on which to support a reasonable suspicion of danger from inside the home that would constitutionally

justify a protective sweep." R. 38, PID 215. He also argued that Conley's consent was not voluntary as she "was young, nervous, handcuffed and alone in the residence with police officers." *Id.* Stewart filed a second motion to suppress on March 12, 2018. Stewart again asserted that Conley was handcuffed when she purportedly gave consent. He also argued that as an overnight guest he had a reasonable expectation of privacy in the Residence. The government responded on May 16 and asserted that Stewart had "not raised any additional issues" to those considered during the hearing on Moore's motion. R. 70, PID 354-55.

The court held a hearing on Stewart's suppression motion on August 7, 2018. The government argued that Stewart presented "essentially the same issues" as those presented by Moore. R. 105, PID 439. And Stewart's counsel agreed:

> THE COURT: Is there anything different, Mr. Kersey, in this?
> MR. KERSEY: No, there wouldn't be, Your Honor. My client was—
> THE COURT: He didn't rent the location, he—
> MR. KERSEY: No, he was an overnight guest, Your Honor. The same thing. He was an overnight guest, same as Mr. Moore.
> . . .
> THE COURT: All right. So is there anything in addition on the motion that you want to offer?
> MR. KERSEY: No, there isn't, Judge.
> THE COURT: How about you, Mr. Howell?
> MR. HOWELL: Nothing additional to add, Your Honor. The testimony, I think we covered everything as far as those particular issues that were raised. We wouldn't have anything additional to add to that.
> THE COURT: All right. Well, then the ruling would be the same.
> …
> THE COURT: Okay. Mr. Kersey, anything further?
> MR. KERSEY: No, Judge. I take it then the Court's going to take a nunc pro tunc entry on the hearing that would coincide with your ruling on . . . Mr. Moore?
> THE COURT: Unless you have something in addition that you'd like to—
> MR. KERSEY: Judge, I don't. I don't want to mislead the Court. I don't at this point. The testimony would come out the same. I'm not putting my client on the stand, so nothing would be any different. I just ask the Court take that into consideration.

*Id.* at 439, 441, 451-52

After obtaining new counsel, Stewart filed a motion to reopen the suppression hearing on September 12, 2018. He argued that certain arguments "were not presented or were neglected by defense counsel for Mr. Moore during the initial suppression hearing" and that "the Court was left with a defective record" in part because Conley had not testified. R. 93, PID 418.

On November 5, 2018, Stewart filed a brief in support of his motion to reopen and requested that the court "conduct a hearing on the multiple, additional issues concerning this unconstitutional search." R. 107, PID 470. Stewart argued that witnesses who had not testified, including Stewart himself, were "vital to the establishment of key issues." *Id.* at 474. He further argued that Moore's statement after his arrest ("You got me. You can go ahead and leave now.") constituted denial of entry into the Residence. *Id.* at 478. Stewart attached his own affidavit as well as the affidavit of co-Defendant Jason Cousins.

In his affidavit, Stewart stated that he awoke on the morning of November 17, 2016, to Conley and Moore discussing the presence of police outside. Conley went downstairs to answer the door. After getting dressed, Stewart followed her:

> I came down the stairs to see what was going on. It was my intention to tell the officers to leave the premises and close the house door, because I observed them still there talking to Mrs. Conley, and she was asking the officers: "What are y'all doin here, what do you want?" By the time I reached the landing of the steps, I heard them say: "there's somebody else!" then approximately three officers ran into the house and grabbed each side of my body and pushed me down on the floor inside the home, I was about ten feet from the door. . . . They sat me down on the top step of the porch, I was approximately ten feet away from Conley and I could see her standing there at the door. She was inside the house and I heard her crying and screaming after she seen them arrest me. As I recall, when she seen them putting the handcuffs on me that's when she started crying. She appeared very scared and upset and they (about four or five officers) immediately moved into the house with her and partially shut the door behind them. . . . They never asked if they could go in the house they just walked in, and when I seen them going in the house I told them: "you can't go in there, where's your warrant?" An officer nearby said to me: "you want to go to jail?" After this, I couldn't hear them talking to her very well because they started speaking very softly and the door was nearly closed, but

after about ten minutes, I heard her shouting and she clearly said: "No y'all can't search my house, I don't want y'all tearin my house up!" This is when I shouted to them in the house "go get a warrant, go get a warrant! Y'all don't have no search warrant, y'all can't search your breakin the law." After I said that, a few of them came out of the house and started whispering, then they went back in the house and I didn't hear anything else for about another ten minutes when I heard Conley ask if she could call her mom. Approximately twenty minutes or so after that, officers came out and Midock told me I was free to leave and officers uncuffed me.

R. 107-1, PID 502-03. In his affidavit, Cousins stated that on the morning of November 17, 2016, he was joined into a three-way call with his sister, Tami Cousins, and his niece, Conley:

Conley sounded scared and distraught, her voice was wavering and it sounded as if she had been crying. . . . Conley [said] the following to my best recollection:

Uncle, I'm scared, they won't get out of my house, they won't leave, they keep asking me can they search, I told them no, they're refusing to leave, saying that they gonna get a search warrant and search the house, and if I don't let them search *before* they get the warrant, then they gonna charge me with anything they find because they know that 'Chill' (William Moore), is known to have drugs and guns and they just want to go through the house to make sure.

Mrs. Conley then asked me what she should do, and I told her to put me on speaker phone. After she placed me on speaker phone, I stated clearly and loudly over the phone to any officer who may be in the vicinity: "She doesn't want you in the house, get out of the house right now! She doesn't give you consent to search the house." I then heard her say in a desperate and weary voice: "I don't want y'all searching and tearin up my house, I just want y'all to please . . . just leeeave." I then stated: "Niece . . . what are they doing?" And she said with a heavy sigh: "They are still not leaving . . . they said that they are waiting on a search warrant." The entire call that I was a party to, lasted approximately five minutes.

*Id.* at 504-05.

**C. Trial**

Prior to the beginning of trial on December 3, 2018, the court addressed Stewart's renewed motion:

> THE COURT: Now, Mr. Jenkins, you wanted to have a hearing on your motion to suppress. I'm not quite sure; I read your motion, but there was a consensual search of the premises. Do you have something that's going to change that?
> MR. JENKINS: No, Your Honor. I stand by the brief.
> THE COURT: Okay. I mean, I'll listen during the course of the trial, too, if there's something that would change the decision. I mean, the record should probably reflect that we had the motion to suppress hearing on Mr. Moore's case, the same property.

R. 188, PID 1050. In a marginal order issued the same day, the district court ruled: "Def[endant] to rely on written motion. At this point, there is no reason to reopen suppression hearing. Court to listen to all testimony in the trial on issue of search." R. 124, PID 614.

Moore testified that on the morning of November 17, 2016, he saw officers surrounding the Residence: "Then Markianna went downstairs. She talked to them and came up crying, said they're looking for me." R. 189, PID 1141. Moore then went downstairs, stepped onto the porch, and the officers arrested him: "Then they put me in the truck, handcuffed me, then they waited." R. 188, PID 1085. From the truck, Moore saw Stewart come out of the house. Moore did not see Stewart placed in handcuffs but saw the officers release Stewart and saw him drive away in a van. Moore also saw a dozen police officers enter the Residence.

Conley testified that in October of 2016 she moved into the Residence on Dartmouth Avenue with her boyfriend, Richardson-Fields, to be closer to her mother and other relatives. Stewart paid for the security deposit and first months' rent and Conley was to pay the utilities. Shortly after Conley moved in, Moore also began to stay at the Residence. On the morning of the raid, Conley, nineteen years old at the time, was alone in her bedroom and, looking through her window, saw police gathering around the Residence. After she heard knocking, she "opened up the door,

and they said they were looking for William Washington Moore." R. 189, PID 1308. Conley told the officers that she did not know if he was home. They asked if they could come inside and speak with her. She denied them entry and said she would speak to them on the porch but that she had to put on her shoes. She went back upstairs, saw Moore in the guest bedroom, and told him the police were asking for him. Moore told Conley he would turn himself in and she proceeded to get her shoes. Moore went downstairs and Conley followed shortly thereafter:

> Q. And what happened then?
> A. The marshal pulled me out the door and put me in handcuffs.
> Q. And what did they talk to you about?
> A. They asked—well, they pulled William out, and he was saying you guys got me, you don't need to handcuff her. Let her go. She don't have anything to do with this, y'all got me. They put me in handcuffs and they asked if there was any-one else in the house, I said no—I said, I don't know, I'm sorry. I said, I don't know.
> . . .
> Q. All right. What happened then?
> A. Maurice came downstairs with his hands up. They put him in handcuffs and sat him on the porch.
> Q. All right. And did the marshals then continue to ask if there was anybody else in the house?
> A. Um, they didn't—I don't think that they asked was there anyone else—I think that they asked was anyone else. I'm not really sure.
> Q. And did you ever tell them firmly yes or no whether there was anybody else in the house?
> A. I mean, we all, like all three of us was out there, so that was it. They said was anybody else in the house. I was shaking, I didn't say anything. I was just standing there.
> Q. At some point did they ask you if it was okay to go in and search or look around to see if there was anybody else in the house?
> A. No. He just said I'm going to go in there and see if there's anybody else in the house.
> Q. At some point did they ask for your consent, your permission to do a further search of the house?
> A. Yes. After he—after he came from doing his people search he came, and he took me out of handcuffs. They let Maurice go, and they took Chill to the—William to the car, and he was like, um, is this your house. I said yes. And he was like, well, we believe there's some bad things in the house, and could you give us consent to search the house.

R. 189, PID 1309-11.  Conley also testified that when "Maurice came down with his hands up"

the officers "stepped in, grabbed him."  R. 190, PID 1345.  Conley then called her mother:

> Q.  Did your mom tell you not to give consent?
> A.  Um, at first she was saying no, and then eventually yes.  You know, eventually
> they was like either we're going to sit here and you are going to let us, or we are
> going to go and get a warrant from the judge, so eventually it just came down to,
> okay, let them search.

R. 189, PID 1312.  Conley also testified that one of the marshals said, "[I]f you let us search we're

not going to take you to jail."  R. 190, PID 1346.  Officers removed the handcuffs, which had been

on between ten and thirty minutes, and led Conley on a walk-through of the Residence.

The government also called Michael Volpe, an officer with the Canton Police Department

and a member of the FBI Safe Streets Task Force.  On November 17, 2016, Volpe received a call

from a Canton detective who stated that officers were at the Residence and "were there to arrest

William Washington Moore on several warrants out of the West Virginia area.  They stated while

they were there they had got William Moore in custody, and during them taking custody of William

Moore they conducted a protective sweep of the residence" and discovered firearms and narcotics.

R. 190, PID 1482.  Volpe then travelled to the Residence:

> So when I first responded to the house I briefly talked to Markianna Conley, and I
> briefly talked to her about her age, where she came from, why she was here; but
> more specifically . . . I was advised that they were talking to her about the consent
> to search of this residence.
> . . .
> She appeared, one, young; she appeared very nervous. She appeared as if she had
> never experienced this situation in her life, that this was a first for her, being in the
> presence of such a large presence of law enforcement officers.
> In my brief discussion with her about a consent she was going back and forth, she
> wanted to talk to her mom, who she identified as Tamara Cousins.  And she was
> very wishy-washy, very nervous about the situation.
> So at that point, based off of what was seen in probable cause, that's when I stopped
> communication with Markianna, and I decided at that point I was going to obtain a
> search warrant.

R. 190, PID 1506. Officers informed Volpe that "they had seen a rifle, an AR-15. The rifle they said was in an upstairs closet. They said the rifle was in a downstairs closet, and . . . also said there was a black book bag." *Id.* at 1482. Volpe then completed a search warrant affidavit, which stated in relevant part:

> 5. Affiant is aware that when U.S. Marshalls arrive at 1139 Dartmouth Ave. SW, Canton, they make contact with Markiawna [sic] Conley, DOB: 06/03/1997, who answers the front door. Conley is evasive and nervous when answering questions as to whether William Moore is in the residence. William Moore then comes to the front door and turns himself over to the U.S. Marshalls who take him into custody on the front porch of the residence.
>
> 6. Upon questioning Conley further about whether there is any other individuals in the home, she remains evasive and continues to tell Officers that she is unsure if anyone else is in the residence at 1139 Dartmouth Ave. SW, Canton, McKinley Township, Stark County, Ohio. At this time another male individual walks down the front steps. He is taken into investigative custody.
>
> 7. Affiant is aware that Conley then gives U.S. Marshalls on scene permission to search the residence for any other individuals that may be there for Officer safety purposes.
>
> 8. Upon searching the residence at 1139 Dartmouth Ave. SW, Canton, McKinley Township, Stark County, Ohio, for any other individuals, officers locate a black pump style shotgun in the second story southeast bedroom.
>
> 9. Also, while searching the first floor dining room, Officers locate a black open book bag behind a recliner chair that contains several large shrink wrapped bundles containing a brown powder looking substance. Based on Affiant's training and experience with narcotics, the substance is consistent with a large amount of packaged heroin.
>
> 10. Officers upon seeing the weapon and suspected heroin then secure all individuals in the residence and have secured the residence at for further investigation.

R. 16-2, PID 66. After submitting the affidavit and obtaining a search warrant, Volpe returned to the Residence and participated in a second search. Officers did not request fingerprints for the Mossberg shotgun or AR-15 rifle.

Before the trial concluded, Stewart's counsel again addressed the warrantless search:

> MR JENKINS: Judge, there was one other issue I wanted to address, and that was the suppression issue. I think testimony has come out from witnesses that there were about a dozen armed officers who stormed into the house as soon as Mr. Chill Will Moore was outside and under arrest. There was also testimony by Ms. Conley that she had been handcuffed initially and led in, so there's certainly some issues there as far as the suppression issue.
> And I know the Court has had an open mind towards this and agreed to hear further testimony before actually rendering a decision on it, so I'd ask you to consider our renewed motion to suppress the evidence.
> THE COURT: I actually rendered a decision on that before, but I said I would listen to all of the testimony. I'm not quite sure whether there's any expectation of privacy by Mr. Stewart in that home, the occupant of the home was Ms. Conley. She said that she was given an opportunity to talk to her mother, and she did say she was scared and nervous, that's true, but she said she made the decision to give consent to the search. I think that kind of ends it.

R. 191, PID 1549-50.

On December 7, 2018, the jury found Cousins and Stewart guilty of all charges. On December 26, Stewart filed a motion for a new trial. Stewart argued in part that the district court had erred in failing to grant him a suppression hearing. During the sentencing hearing, the court addressed Stewart's argument:

> And as to the motion to suppress, I mean you got your snit about that. We had a motion to suppress with Mr. Moore, and then all three of your lawyers filed to have an additional motion to suppress. We asked everybody, you have any evidence that you want; nope. They could have called you if that's what it was or could have indicated there was other evidence they wanted to offer, something that would change the decision. And they all said no. And now for you to come in here and say oh, I should have had another hearing on that, it doesn't carry any water.

R. 198, PID 1738-39.

## II. Analysis

Under the Fourth Amendment, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "'[P]hysical entry of the home is the chief evil against which the wording

of the Fourth Amendment is directed.'" *Payton v. New York*, 445 U.S. 573, 585-86 (1980) (quoting *United States v. U.S. Dist. Court*, 407 U.S. 297, 313 (1972)). "To supplement the bare text, [the Supreme Court] created the exclusionary rule, a deterrent sanction that bars the prosecution from introducing evidence obtained by way of a Fourth Amendment violation." *Davis v. United States*, 564 U.S. 229, 231-32 (2011).

Stewart argues that the search of the Residence resulting in the seizure of firearms and narcotics violated the Fourth Amendment and asks this court to reverse the denial of his motions to suppress. "On appeal from the denial of a motion to suppress, we review the district court's findings of fact for clear error and its conclusions of law *de novo*." *United States v. Brown*, 449 F.3d 741, 744 (6th Cir. 2006). "Whether a search was reasonable under the Fourth Amendment is a question of law which is reviewed *de novo*." *United States v. Pearce*, 531 F.3d 374, 379 (6th Cir. 2008); *see also Ornelas v. United States*, 517 U.S. 690, 691 (1996) ("[T]he ultimate questions of reasonable suspicion and probable cause to make a warrantless search should be reviewed *de novo*."). "Further, in reviewing the denial of the motion, we may consider trial evidence in addition to the evidence admitted at the suppression hearing." *United States v. Hardin*, 539 F.3d 404, 417 (6th Cir. 2008).

### A. Search of the Residence

"A warrantless search or seizure is '*per se* unreasonable under the Fourth Amendment-subject only to a few specifically established and well-delineated exceptions.' Consent is one such exception." *United States v. Roark*, 36 F.3d 14, 17 (6th Cir. 1994) (citation omitted) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). Another such exception was recognized in *Maryland v. Buie*: "A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory

visual inspection of those places in which a person might be hiding." 494 U.S. at 327. The majority concludes that the protective-sweep exception applies here. I disagree.

I would remand for further proceedings on Stewart's motion to suppress. As explained below, Stewart had standing to challenge the search, *Buie*'s protective-sweep exception did not justify the search, and the district court abused its discretion by failing to adequately engage with the evidence and law when addressing the consent issue.

### 1. Standing

Stewart argues that he has standing as an overnight guest of the Residence to challenge the constitutionality of the search. He asserts that "after hearing the testimony at trial, the district court suggested that it believed that Stewart had no standing." Stewart Br. at 39. The government concedes "that Stewart was an overnight guest at the Dartmouth Avenue house on the night of November 16 to 17, 2016, and as such, had standing to challenge the search." Appellee Br. at 36.

"The Sixth Circuit has generously construed the Fourth Amendment as protecting nearly all overnight guests, even when the guest occupies a common area in the apartment that is not private from other residents." *United States v. Washington*, 573 F.3d 279, 283 (6th Cir. 2009). It is undisputed that Stewart was an overnight guest, that he paid for the deposit and first month's rent, and that he furnished the Residence. Stewart had a reasonable expectation of privacy in the Residence and has standing to challenge the search.

### 2. Protective Sweep

The district court noted that there are "two ways that a protective sweep could be conducted. One is with consent, and another is that based on the totality of the circumstances. Under *Maryland versus Buie*, . . . even if a suspect is outside, the residence can be given a protective sweep . . . ." R. 33, PID 181. The court concluded, "I think it would behoove the officers to do at

least a protective sweep at that time, and the fact that [Conley] consented kind of ends that analysis under the totality of the circumstances." *Id.* at 184. Stewart argues that "[e]ven in the absence of consent, the district court would have erred by finding that any protective sweep was justified." Stewart Br. at 49. The government responds that "the totality of the circumstances justified the sweep, with or without" consent. Appellee Br. at 39. The majority concludes that a protective sweep was justified and thus does not reach the consent issue. I disagree.

The government—and the majority—assert that the warrantless search was constitutionally reasonable under *Maryland v. Buie*. In *Buie*, the Supreme Court identified two types of reasonable searches:

> First, during a search incident to an arrest occurring inside a home, officers may, "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." Second, officers may conduct a search more pervasive in scope when they have "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." This sweep may "extend only to a cursory inspection of those spaces where a person may be found," and may last no longer than "is necessary to dispel the reasonable suspicion of danger . . . ."

*Colbert*, 76 F.3d at 776 (citations omitted) (quoting *Buie*, 494 U.S. at 334-36). Because Moore peaceably came to the porch, officers arrested him outside the Residence, and the warrantless search extended to the entire Residence, the first type of *Buie* search is inapplicable. "This case involves the second, more pervasive type of *Buie* search." *Id.* The government has "the burden to prove the constitutionality of the warrantless search." *Archibald*, 589 F.3d at 295.

To that end, the government relies on several of this court's decisions applying *Buie*. Each is inapplicable to the facts before us. The majority, for its part, concludes that the police had sufficient reason to believe that someone dangerous remained in the Residence once Conley, Moore, and Stewart exited the home. But it draws several inferences that run contrary to our

recognition that a lack of information cannot justify a protective sweep under *Buie*. I first address the government's discussion of the caselaw and then turn to the majority's rationale.

### a. The Government's Arguments

First, the government cites *United States v. Biggs*, 70 F.3d 913 (6th Cir. 1995). In that case a "Sheriff's Department received information that the defendant, who was wanted on a fugitive warrant, was in a local motel room." *Id.* at 915. Three officers arrived at the motel, observed Biggs's truck in the parking lot, and began surveillance. *Id.* Eventually, Biggs, "barefoot and shirtless," exited his room and the officers arrested him "at his truck." *Id.* The officers then conducted a "protective sweep" of Biggs's motel room and found a firearm in plain view. *Id.* We concluded that the district court did not clearly err in finding "possible danger faced by the officers" based on a "combination of circumstances":

> First, the officers had received information that another person would be meeting defendant at the motel room. Although the officers never saw anyone enter the room during the surveillance period, they did not know if someone was already in the room when they arrived. Second, defendant left the motel room door open so that anyone present in the room had a clear view of the officers, thereby threatening their safety from an unknown person present in the room. Third, the officers were familiar with defendant and knew that he had been arrested on two previous occasions in the presence of someone in possession of a firearm. In addition to these reasons, the officers did not act unreasonably in accompanying a shoeless, shirtless man about to be transported to jail back to his motel room. The door to the room was standing open. The defendant had clothes and other personal items to be retrieved. It was only natural, as a matter of common sense, for the officers to go with the defendant back into the room to retrieve his possessions.

*Id.* at 916. Our conclusion in *Biggs* was contingent on specific evidence that another individual would be meeting the defendant at the motel room combined with the fact that the arrest had not yet been completed when officers entered the room.

The *Buie* "protective sweep" exception permits officers "to take reasonable steps to ensure their safety after, and while making, the arrest." *Buie*, 494 U.S. at 334. This kind of warrantless

"quick and limited search" must last "no longer than it takes to complete the arrest and depart the premises." *Id.* at 327, 336. The exception is designed to allow officers "to protect themselves while making the arrest and removing the prisoner from the house." *United States v. Akrawi*, 920 F.2d 418, 421 (6th Cir. 1990). In the present case, it is undisputed that Moore peaceably exited the Residence, and that officers completed his arrest and secured him in a police vehicle before searching the Residence without a warrant. Midock testified that officers had the person they were looking for secured in handcuffs and had no need to enter the Residence. "If the agents were concerned about safety, it seems unlikely that they would have lingered in the house . . . after confronting [Moore] at the front door with no resistance." *Id.* If entering the Residence after completing Moore's arrest posed a "risk to law enforcement, the prudent course of action would have been to back away from the door, not proceed through it." *Archibald*, 589 F.3d at 300. On this basis alone, the warrantless search exceeded the scope of a *Buie* "properly limited protective sweep." 494 U.S. at 337.

Further, unlike the officers in *Biggs*, the officers here had no "specific and articulable facts that the area to be swept harbor[ed] an individual posing a danger to those on the arrest scene." *Buie*, 494 U.S. at 337. The government asserts that several facts justified the officers' belief that someone in the Residence posed a danger. First, two rental cars were parked outside the residence, "Marshals saw someone looking out of a second-floor window," and "[a]nother individual closed the front door." Appellee Br. at 30, 34. But when officers decided to search the Residence without a warrant, Richardson-Fields had already left in one rental car, and officers had Moore, Conley, and Stewart detained. When officers have three individuals accounted for, a single car and the prior observation of two individuals does not rationally suggest anyone else is inside. Second, the government claims that officers were "concerned about Conley's safety" because she "was acting

'extremely nervous' [sic] and 'evasive,' and would not answer DUSM Midock's questions." *Id.* at 30. But "[a]ppearing nervous under such circumstances strikes us as being the norm rather than the exception." *United States v. Mesa*, 62 F.3d 159, 163 (6th Cir. 1995). And Conley consistently made it clear that she wanted the officers to leave. Third, the government asserts that "the fact that the Marshals knew Moore had been convicted of murder and was wanted on gun and drug charges bore on whether there could be firearms in the home." Appellee Br. at 32. But that is "irrelevant to the inquiry . . . . The facts upon which officers may justify a *Buie* protective sweep are those facts giving rise to a suspicion of danger from attack by a third party during the arrest, not the dangerousness of the arrested individual." *Colbert*, 76 F.3d at 777. The record reveals no facts supporting the conclusion that another person inside the Residence posed a danger.

The government also points to our unpublished decision in *United States v. Beasley*, 199 F. App'x 418 (6th Cir. 2006). In that case, officers arrested Beasley in a hotel parking lot and discovered narcotics and a firearm in his car. *Id.* at 423. Another person was seen observing the arrest from a room believed to be the room in which Beasley had been staying and from which he had just left. *Id.* Officer Holstein then knocked on the door to the room and a young woman let him in. *Id.* at 420. While just inside the door, Holstein observed plastic bags with marijuana residue sitting in plain view on the kitchen counter. *Id.* The woman denied that anyone else was in the room, but Holstein nonetheless conducted a 15-second protective sweep of the bedroom and bathroom areas. *Id.* at 420, 423. During this sweep he saw some digital scales. *Id.* at 420. Police obtained a search warrant based on Holstein's observation of the marijuana and scales and found money, more drugs, and a handgun when executing the warrant. *Id.* at 420, 422. Beasley later argued that the evidence of the scales—seen only during the protective sweep—was tainted by a Fourth Amendment violation, and that without the scales, there was insufficient probable cause

for the search warrant. *Id.* at 422. The district court denied his suppression motion, reasoning that probable cause existed "with or without" the scales, based solely on Holstein's initial observation of the marijuana, which he saw in plain view after receiving consent to enter the room. *Id.* We affirmed that rationale on appeal. *Id.* at 425.

Before doing so, however, the *Beasley* panel commented that the officer's protective sweep was justified:

> It is true that, upon gaining entry into that room, Holstein observed only a female occupant, who complied with the officer's requests and who did not pose a physical threat . . . . Nevertheless, even in the relatively cramped quarters of a hotel room, another more menacing and dangerous individual could easily hide. Thus, because *Holstein had no idea how many other individuals might have been in Room 401*, he was justified in conducting the brief, 15-second sweep of the room to make sure other armed persons were not hiding behind beds or in the bathroom area.

*Id.* at 423 (emphasis added). However, this discussion was not necessary to the panel's ultimate conclusion. The panel went on to reason that even without the scale the police had sufficient probable cause for the warrant based solely on Holstein's initial observation of the marijuana, which he observed after receiving consent to come inside the doorway of the hotel room. *Id.* at 423-25. Thus, we concluded that the district court "appropriately applied" a "plain view analysis . . . to justify the existence of probable cause necessary to issue a warrant" to search the room. *Id.* at 425.

Because it was unnecessary, *Beasley*'s discussion of *Buie* was dictum. *See Freed v. Thomas*, 976 F.3d 729, 738 (6th Cir. 2020) ("[D]ictum is anything 'not necessary to the determination of the issue on appeal.'" (citation omitted)). Moreover, our published cases establish that "[l]ack of information cannot provide an articulable basis upon which to justify a protective sweep." *Colbert*, 76 F.3d at 778. "[A]llowing the police to conduct protective sweeps whenever they do not know whether anyone else is inside a home creates an incentive for the police to stay

ignorant as to whether or not anyone else is inside a house in order to conduct a protective sweep." *Id.* Here, Midock believed that "[a]t any point in time, a threat could materialize," but "did not see a threat." R 33, PID 174, 161. "'No information' cannot be an articulable basis for a sweep that requires information to justify it in the first place."[2] *Colbert*, 76 F.3d at 778.

The present case is more analogous to *Archibald*. In that case, four officers went to Archibald's apartment to serve him with arrest warrants. 589 F.3d at 291. One officer first checked Archibald's criminal history, which "revealed that Archibald had previously been charged with attempted homicide, resisting arrest, evading arrest, assault, drug offenses, and a weapons

---

[2] The government's citation to our unpublished decision in *Grise v. Allen*, 714 F. App'x 489 (6th Cir. 2017) is unavailing. There, police responded to a report of shots fired by Dr. Grise outside his home, and entered the Grises' home with EMS workers to provide emergency medical aid to Dr. Grises's elderly wife when she collapsed just inside the doorway. *Id.* at 492. In light of the ongoing emergency, this entry was justified under the emergency-aid exception to the warrant requirement. *Id.* at 497. While the medical officials provided aid, an officer protected them by conducting a short sweep in the nearby living room, dining room, and kitchen areas; although Dr. Grise had been detained, police knew that there was an unaccounted-for shotgun and that the medical officials were in an exposed position inside the home. *Id.* at 492, 498. In those circumstances, we reasoned that the short sweep was justified under *Buie*. *Id.* at 498. That case is nothing like this one. Here, unlike in *Grise*, there was no reason to enter the home in the first place. *See* R. 33, PID 161 (Midock testifying during suppression hearing that police did not "necessarily need[] to" enter the house once they secured Moore, and then answering "Correct" when asked: "So you didn't need to go in the house?"). Police already had their suspect safely secured in a vehicle outside of the home and there was no ongoing medical emergency requiring first responders to take an exposed position inside of the home. They also were not responding to an emergency call reporting shots fired in the middle of the night, as were the officers in *Grise*. *Grise*, 714 F. App'x. at 498.

The government also points to *Wilson v. Morgan*, 477 F.3d 326 (6th Cir. 2007). In that case, plaintiffs brought claims under § 1983, alleging, in part, that a search of a residence after their arrest violated the Fourth Amendment. *Id.* at 337-38. "The evidence was that as plaintiffs sat handcuffed on the lawn, an officer broadcast over the radio that it appeared that someone else was in the house because a light inside had been turned on and off." *Id.* at 338. Further, a witness informed the officers that "there might have been a weapon in the home" and that there was an intoxicated woman who remained unaccounted for. *Id.* at 339. We concluded that "*[t]ogether*, these facts provide[d] the articulable suspicion that a person possibly posing a danger still lurked in the . . . residence" and that the plaintiffs had "not demonstrated that a material question of fact existed on this issue." *Id.* (emphasis added). As discussed, officers did not have a similar combination of facts in the present case.

Additionally, the plaintiffs in *Grise* and *Wilson* appealed grants of summary judgment and were required to demonstrate a dispute of material fact to prevail. *See Abu-Joudeh v. Schneider*, 954 F.3d 842, 849 (6th Cir. 2020) ("The burden of demonstrating the absence of a genuine dispute of material fact first rests with the moving party. If the moving party meets this burden, the burden then shifts to the nonmoving party to establish a 'genuine issue' for trial via 'specific facts.'" (citation omitted)). Here, the government, not Stewart, has the burden to prove the constitutionality of the warrantless search of the Residence. *Archibald*, 589 F.3d at 295. Cases like *Grise* and *Wilson* thus hold limited value in this context.

offense." *Id.* When officers arrived at the building, Officer Nielsen "began knocking on the front door" while three other "officers positioned themselves approximately eight feet off the porch and to the side of the front door, covering Nielsen." *Id.* "Nielsen knocked on the door repeatedly and heard movement inside the residence; however, no one came to the door or gave a verbal response." *Id.* at 292.

> After approximately three to five minutes of additional knocking, Nielsen heard "a male voice" behind the door say "[w]ho is it?" Nielsen identified himself as a police officer and requested that Archibald "come to the door." There was no response to this request, but Nielsen heard "more shuffling sounds" from inside. "This went on for probably another maybe roughly five minutes. [He] heard some shuffling sounds. Then it would get quiet. And then there were more shuffling sounds." Nielsen stated that his "primary concern was that *whoever* was in there either has a weapon or may have a weapon."

*Id.* Nielsen heard only one voice but assumed others could be inside. *Id.* Approximately ten minutes after Nielsen started knocking, Archibald opened the door. *Id.* Nielsen then "stepped slightly into the apartment, grabbed the Defendant, and took a quick glimpse inside." *Id.* at 293. Two officers then entered the apartment and "conducted a short protective sweep." *Id.* During the search, the officers "observed a substance that appeared to be cocaine." *Id.* They then obtained a search warrant, conducted a second search, and discovered a firearm, later used as evidence of a felony. *Id.* The district court denied Archibald's motion to suppress the firearm evidence and Archibald appealed. *Id.* at 291. On appeal, the government argued that the warrantless search was reasonable under *Buie* because of (1) the "defendant's prior arrests for violent crimes; (2) the 'particular vulnerability' of the officers; (3) Archibald's delay in responding to the knocking and announcement by Nielsen; (4) 'noises from inside defendant's residence'; and (5) Archibald's arrest and the protective sweep occurred simultaneously." *Id.* at 298. We rejected each justification and reversed. *Id.* at 298-302.

Here, as in *Archibald*, the "defendant's own dangerousness is not relevant" to the *Buie* analysis. *Id.* at 299. As in *Archibald*, "the record contains no evidence, circumstantial or otherwise, of the presence of a dangerous third party in" the Residence.[3] *Id.* As in *Archibald*, the government's "burden is not reduced because the officers were unable to view the entire residence or because they felt 'particularly vulnerable' based solely on their location." *Id.* at 299-300. And as in *Archibald*, "ignorance or a constant assumption that more than one person is present in a residence" cannot justify the warrantless search. *Id.* at 300.

Because officers completed Moore's arrest and secured him in a police vehicle prior to searching the Residence, the warrantless search exceeded the scope of a *Buie* "protective sweep." And because the government cannot present "specific and articulable facts" that the Residence "harbor[ed] an individual posing a danger to those on the arrest scene," it has failed to meet its burden of proof. *Buie*, 494 U.S. at 337; *see also Archibald*, 589 F.3d at 301-02.

### b. The Majority's Reasoning

The majority concludes that the government satisfied its burden of demonstrating that particularized facts created a reasonable suspicion that someone other than Conley, Stewart, and

---

[3] For this reason, the government's reliance on our unpublished decision in *United States v. Crail*, 553 F. App'x 540 (6th Cir. 2014) is misplaced. In that case, the FBI arrested Crail at his home. *Id.* at 540. When officers arrived at the address, "[a] vehicle was parked in the driveway that was not the vehicle registered to Crail." *Id.* Crail "came out on the front porch to be searched and handcuffed. While talking with Crail, the agents heard and saw movement inside the house through the partially opened door. Some of the agents entered the house to perform a protective sweep." *Id.* During the search, officers found Crail's wife and another man, in addition to "drug paraphernalia, firearm packaging and ammunition, and, in the basement, a marijuana cultivation operation" in plain view. *Id.* at 540-41. Crail moved to suppress the evidence. *Id.* at 541. We concluded that the *combination* of specific facts available to the officers justified the belief that other individuals in the home posed a danger: (1) a car not registered to Crail, (2) information that two additional individuals lived at the home, (3) "movement inside the house while Crail was at the front door," and (4) officers "had to wait at the house until a police van arrived to transport Crail, subjecting them to a more prolonged threat." *Id.* This combination of facts rendered the search reasonable. *Id.* at 541-42. The facts that led us to conclude the *Crail* search was reasonable are not present in this case. Here, officers had information that two individuals, Conley and Moore, resided at the Residence. Officers saw Richardson-Fields leave and had Conley, Moore, and Stewart detained. Officers saw no further movement and Moore was already secured in a police vehicle. Unlike in *Crail*, there are no specific facts here suggesting that another individual in the Residence posed a danger.

Moore was inside the Residence. It points to the following facts to support that conclusion: (1) Moore was wanted on gun and drug charges; (2) there were two rental cars outside the home[4]; (3) when pulled over, Richardson-Fields said nothing about whether anyone was in the home; (4) outside the house, Conley seemed nervous and Moore—once arrested—asked police to leave; and (5) before Moore, Stewart, and Conley came out of the house, officers saw someone in an upstairs window. Majority Op. at 20-21. For many of the reasons already noted above, the majority's arguments as to each of these facts are flawed.

First, the majority asserts that police had a reason to believe someone else was in the home because Mr. Moore "lived there and was wanted on gun and drug charges." Majority Op. at 20. To the majority, these facts "raised the reasonable suspicion that others might be inside if [Moore] were continuing drug-trafficking activities." *Id.* The majority never explains how Moore's drug and gun charges suggest that someone other than Moore, Conley, and Stewart was inside the home. Perhaps these charges increase the likelihood that guns or drugs were in the home, but the *Buie* analysis is concerned with the presence of *people*, not *evidence*. Moore's charges say nothing about the former. *Cf. Archibald*, 589 F.3d at 299 ("[A] defendant's own dangerousness is not relevant in 'determining whether the arresting officers reasonably believed that *someone else inside the house* might also pose a danger to them[,]' as those facts reflected only the dangerousness of the arrested individual, not others." (second alteration in original) (quoting *Colbert*, 76 F.3d at 777)).

The majority next asserts that police saw two rental cars outside, that rental cars are often used by drug traffickers, and thus, the presence of multiple rental cars could be taken to mean

---

[4] There was, in fact, only one car outside the home when the police searched it. The majority recognizes this fact in its background section but omits it in the discussion section. *Compare* Majority Op. at 4 ("Richardson-Fields had left earlier in one of the rental cars.") *with id.* at 20 ("The presence of more than one car also indicated that there were likely others in the house besides Mr. Moore.").

multiple drug traffickers were inside the home. Majority Op. at 20. But there was only one rental car outside the home when police searched it. The other car had driven away. The police knew that; they pulled over the second car once it drove away. Any reasonable inference based on the two cars disappeared once the second car left, which happened well before the police decided to search the Residence.[5]

Third, the majority suggests that police had reason to believe someone other than Moore, Conley, and Stewart was in the home because Richardson-Fields refused to provide them information. *See* Majority Op. at 20 ("Mr. Richardson-Fields's refusal to answer questions about whether others, including Mr. Moore, were in the house or whether guns were in the house would also reasonably arouse suspicion that indeed both were true."). In essence, this amounts to a suggestion that police had specific and articulable facts because Richardson-Fields did not give them any specific and articulable facts. This reasoning contradicts our repeated recognition that a lack of information does not create reasonable suspicion under *Buie*. *See Archibald*, 589 F.3d at 300 ("*Buie* requires more than ignorance or a constant assumption that more than one person is present in a residence. . . . [A] lack of knowledge as to whether others were in a home necessarily fail[s] the *Buie* standard because that standard requires 'articulable facts,' not ignorance[.]" (citation omitted)); *Colbert*, 76 F.3d at 778 ("'No information' cannot be an articulable basis for a sweep that requires information to justify it in the first place.").[6]

---

[5] The majority cites *United States v. Stover*, 474 F.3d 904, 910-12 (6th Cir. 2007) for the proposition that the "presence of multiple vehicles contribute[s] to reasonable suspicion justifying [a] protective sweep." Majority Op. at 20. But there were not multiple vehicles present when police searched the Residence, so that proposition is irrelevant here.

[6] This rationale is particularly troubling because it suggests that when someone declines to answer police questions—a clear constitutional right—police may simply assume the most helpful (i.e., suspicion-generating) answers to those questions. *See* Majority Op. at 20 (noting that Richardson-Fields's refusal to answer questions about whether guns or people other than Moore were in the home would "reasonably arouse suspicion that indeed both were true"). That sort of approach allows police to unilaterally manufacture reasonable suspicion where none previously existed.

The majority's fourth point suffers from a similar flaw. The majority suggests that the police had reason to believe someone was in the home because Conley appeared nervous and evasive, and because Moore asked police to leave the home once he had been arrested. Majority Op. at 20-21. That a nineteen-year-old was nervous when a dozen police officers came to her home with guns drawn and placed her in handcuffs says nothing about whether other people were inside the home. As noted, appearing "nervous under such circumstances" is the "norm rather than the exception." *Mesa*, 62 F.3d at 163. Similarly, Moore's statement—that police got him and could leave—also says nothing about whether someone else was in the home.

Fifth, and finally, the majority notes that police saw someone in an upstairs window. Majority Op. at 20. But that was before Conley, Moore, or Stewart exited the Residence. The police subsequently observed both Moore and Stewart come downstairs and leave the house. The mere fact that police saw a person inside the Residence before approaching it does not suggest that anyone remained inside once Conley, Moore, and Stewart left. That is especially true given the complete absence of other contextual facts suggesting that anyone remained in the home after those three had exited.

In sum, because there were no specific and articulable facts suggesting that anyone dangerous remained in the Residence once Conley, Moore, and Stewart came outside, the *Bouie* protective-sweep exception did not justify the warrantless search here.

### 3. Consent

Stewart argues that the district court erred in concluding that the search was reasonable based on Conley's consent because (1) officers requested Conley's consent after completing the "protective sweep," (2) Conley's consent was not voluntary and (3) Stewart denied consent. Stewart Br. at 44-49. Stewart also argues that "[a]lthough plenty of time remained to hold a suppression

hearing before trial, the district court waited until the first day of trial to address these new claims and issues" and it therefore "erred in failing to hold a suppression hearing for Stewart's issues." Stewart Br. at 30. The majority does not discuss consent because it concludes that *Buie* justified the search. Majority Op. at 16. I would remand for another suppression hearing.[7]

After his suppression hearing on August 7, 2018, Stewart submitted a motion to reopen the hearing on September 12. In that motion, he requested a new evidentiary hearing because Conley had not testified and the "Court was left with an incorrect story as to the key issue in this case: consent." R. 93, PID 419. He also argued that his prior counsel's poor performance warranted a new hearing: "Failure of counsel to present this key witness for the Court's review cannot be considered sound trial strategy." R. 93, PID 419. Then, on November 5, Stewart submitted a supplemental brief and requested that the court "conduct a hearing on the multiple, additional issues concerning this unconstitutional search." R. 107, PID 470. He argued that Conley's purported consent to the search was not free and voluntary, but coerced. Stewart also argued that his own objection to the search as a present occupant "invalidated any consent that may have been given by other parties" and attached new evidence not previously considered by the district court—his own affidavit and that of Cousins. R. 107, PID 492.

The district court did not respond to these submissions until December 3, the day trial began. The court reiterated that "there was a consensual search of the premises" but added that it would "listen during the course of the trial, too, if there's something that would change the

---

[7] I agree with the majority that the district court did not violate Federal Rule of Criminal Procedure 12(d). I disagree to the extent the majority's discussion of this issue implies that a new suppression hearing was not warranted to address the consent issue. I also disagree with the majority's suggestion that Stewart "failed to challenge the denial of his motion to reopen the suppression hearing in his opening brief[.]" Majority Op. at 18 n.4. He preserved the issue. *See* Stewart Br. at 30 ("Stewart raised additional legal issues and noted that it [sic] sought to call additional witnesses, including himself. A new hearing was needed to cover these issues . . . .").

decision." R. 188, PID 1050. The court did not acknowledge the new evidence or arguments.[8] The same day, the court issued a marginal order, which stated, "At this point, there is no reason to reopen suppression hearing. Court to listen to all testimony in the trial on issue of search." R. 124, PID 614. Then, at the close of trial, Stewart's counsel raised the issue again, noting trial testimony that "there were about a dozen armed officers who stormed into the house" and that Conley "had been handcuffed initially." R. 191, PID 1549. The district court responded:

> I actually rendered a decision on that before, but I said I would listen to all of the testimony. I'm not quite sure whether there's any expectation of privacy by Mr. Stewart in that home, the occupant of the home was Ms. Conley. She said that she was given an opportunity to talk to her mother, and she did say she was scared and nervous, that's true, but she said she made the decision to give consent to the search. I think that kind of ends it.

R. 191, PID 1550.

We review a district court's denial of a motion to reopen a suppression hearing for abuse of discretion. *United States v. Pittman*, 816 F.3d 419, 424 (6th Cir. 2016). "'Abuse of discretion is defined as a definite and firm conviction that the trial court committed a clear error of judgment.'" *United States v. Flowers*, 963 F.3d 492, 497 (6th Cir. 2020) (quoting *Landrum v. Anderson*, 813 F.3d 330, 334 (6th Cir. 2016)).

The district court recognized that its initial determination that the search was reasonable was based on a record created by Moore, not Stewart. And it acknowledged the shortcomings of Stewart's attorneys. But the district court did agree that it would listen to trial testimony and reevaluate its determination that the search was justified by Conley's consent. Despite this

---

[8] Although Stewart's counsel, when asked if anything would change the court's decision, responded, "No, Your Honor. I stand by the brief," that brief requested a hearing and contained new evidence and arguments not previously considered by the court. R. 188, PID 1050. Further, there is no indication that the district court offered a full evidentiary hearing on the matter.

agreement, and despite Stewart's motions raising new disputes of fact, the district court insufficiently engaged with the law and the additional evidence before it.

"Consent is voluntary when it is 'unequivocal, specific and intelligently given, uncontaminated by any duress or coercion.'" *United States v. Beauchamp*, 659 F.3d 560, 571 (6th Cir. 2011) (quoting *United States v. Moon*, 513 F.3d 527, 537 (6th Cir. 2008)). "Voluntariness is determined by examining the totality of the circumstances." *Id.* at 571-72. "Relevant considerations include the characteristics of the person being interviewed—age, education, intelligence—and the circumstances of the situation, like whether the police told [her] about [her] constitutional rights, how long the interview lasted, and whether police asserted authority to take the action regardless of consent." *United States v. Parrish*, 942 F.3d 289, 294 (6th Cir. 2019). "While the police do not have to inform an individual of [her] right to refuse, the absence of such a warning is considered in the totality of the circumstances analysis." *Beauchamp*, 659 F.3d at 572. "[A] court should consider the details of the detention, including the length and nature of detention, the use of coercive or punishing conduct by the police, and indications of 'more subtle forms of coercion that might flaw [an individual's] judgment.'" *Id.* (alteration in original) (citations omitted) (quoting *United States v. Watson*, 423 U.S. 411, 424 (1976)). Further, "hostile police action against a suspect's family is a factor which significantly undermines the voluntariness of any subsequent consent given by the suspect." *United States v. Ivy*, 165 F.3d 397, 404 (6th Cir. 1998). And "a response conveying an expression of futility in resistance to authority or acquiescing in the officers' request" is insufficient to constitute consent. *United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999).

The district court failed to evaluate the totality of the circumstances. Midock testified that other officers had their weapons drawn, "covering" the first-floor windows, when Conley

answered the door. R. 33, PID 135-36. At trial, Moore testified that after Conley answered the door, she "came up crying." R. 189, PID 1141. Volpe testified that Conley "appeared, one, young; she appeared very nervous. She appeared as if she had never experienced this situation in her life, that this was a first for her, being in the presence of such a large presence of law enforcement officers." R. 190, PID 1506. And Conley testified, "I was shaking," R. 189, PID 1310, and, "I was still in shock, basically, that I'm in handcuffs, and all of these police officers are around at the time." R. 190, PID 1385. Volpe saw that Conley "was going back and forth" and that "she was very wishy-washy, very nervous about the situation." R. 190, PID 1506. He determined that it was better to "stop[] communication with Markianna, and . . . obtain a search warrant." *Id.* Further, Conley initially refused to consent to the search and relented only after officers persisted and threatened to search anyway. One of the officers told Conley, "[I]f you let us search we're not going to take you to jail." R. 190, PID 1346. Conley testified, "[E]ventually they was like either we're going to sit here and you are going to let us, or we are going to go and get a warrant from the judge, so eventually it just came down to, okay, let them search." R. 189, PID 1312. Given this testimony, the mere observation that Conley "said she made the decision to give consent to the search" is not enough. R. 191, PID 1550. Conley's consent could justify the search only if it was "'unequivocal, specific and intelligently given, uncontaminated by any duress or coercion.'" *Beauchamp*, 659 F.3d at 571 (quoting *Moon*, 513 F.3d at 537).

Equally important, the district court did not engage with the testimony regarding the timing of the protective sweep. Midock testified that Conley agreed to speak with him inside, then spoke with her mother on the phone, then provided consent, and "[s]hortly thereafter [the officers] went ahead and did a protective sweep of the house." R. 33, PID 141-43. But that testimony was contradicted by Conley, who testified at trial that officers "pulled [her] out the door and put [her]

in handcuffs," then conducted a protective sweep, then an officer asked for consent "after he came from doing his people search." R. 189, PID 1309-11. Conley's testimony was consistent with Volpe's testimony that he was called to the scene after officers conducted a protective sweep and found narcotics and firearms, and that when he arrived "they were talking to [Conley] about the consent to search of this residence" and Conley asked to call her mom. R. 190, PID 1506. Further, Stewart stated in his declaration that officers "never asked if they could go in the house they just walked in." R. 107-1, PID 503. The district court failed to consider the evidence contradicting Midock's version of events. If the protective sweep occurred before the consent, then the validity of the later consent is irrelevant.

Here, Stewart requested a new hearing in his pretrial motions and raised genuine issues of material fact relevant to consent and the constitutionality of the warrantless search. After counsel relied on his motion, the court agreed to listen to trial testimony for "something that would change the decision." R. 188, PID 1050. However, after Stewart submitted new evidence and after the examination of witnesses at trial, the district court never acknowledged the factual disputes, never made credibility determinations, never analyzed or decided whether Conley's consent was voluntary, never determined the sequence of events, including whether the first search preceded any asserted consent, and never determined whether Stewart could object to the search either because he was an overnight guest or because he paid for the deposit, first month's rent, and furnished the Residence.[9] By failing to engage substantively with these issues, the district court abused its discretion.

---

[9] Stewart further argues, as he did before the district court, that "Conley's consent was insufficient as a result of Stewart's objection." Stewart Br. at 49 (citing *Georgia v. Randolph*, 547 U.S. 103 (2006); *United States v. Ayoub*, 498 F.3d 532 (6th Cir. 2007)); *see also United States v. Johnson*, 656 F.3d 375, 379 (6th Cir. 2011) (holding that express objection to search by part-time occupant with reasonable expectation of privacy was sufficient to render search unreasonable as to him, notwithstanding consent given by full-time occupants of the premises).

In sum, because the protective sweep was not justified under *Buie* and the finding of consent inadequately addressed the evidence, I would vacate the denial of Stewart's motion and remand for further proceedings.[10]

---

[10] The government briefly argues that the evidence obtained from the warrantless search is admissible against Stewart under the good-faith exception to the exclusionary rule. The government makes this argument for the first time on appeal. Although the government presented arguments at Stewart's suppression hearing, submitted two responses to Stewart's suppression motions, and further argued at trial and at sentencing for the validity of the search, it never raised the good-faith exception with respect to Stewart. "[T]he government failed to raise this argument in the district court and thus forfeited it." *United States v. Fortney*, 772 F. App'x 269, 276 (6th Cir. 2019); *see also Archibald*, 589 F.3d at 301 n.12 (declining to address the good-faith exception where the government failed to raise, preserve, and argue it).